NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DELLA O'MALLEY,

                    *Plaintiff*,

        v.

                                                    Civ. Action No. 10-6193 (KSH) (CLW)

FAIRLEIGH DICKINSON UNIVERSITY,

                    *Defendant*.                      **OPINION**

**Katharine S. Hayden, U.S.D.J.**

I.      **Introduction**

        Plaintiff Della O'Malley ("O'Malley") has sued her former employer, Fairleigh

Dickinson University ("FDU"), for employment discrimination and retaliation, as well as for

purported state common law violations.  O'Malley alleges in substance that she was subjected to

discrimination, harassment and a hostile work environment, and retaliation as a result of

treatment by her supervisor, Kathy Stein-Smith ("Stein-Smith"), in which FDU acquiesced and

aided.  O'Malley asserts that FDU violated the Age Discrimination in Employment Act of 1967,

29 U.S.C. §§ 621-634 ("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e to 2000e-17 ("Title VII"), because she allegedly experienced discrimination on the

basis of her age, her sex, and her Chinese national origin.  She further asserts common law

claims for breach of contract and fraud.  FDU has moved for summary judgment in its favor on

all of O'Malley's claims.  [D.E. 66.]  Additionally, O'Malley has moved for reconsideration

1

[D.E. 78] of an order striking one of her submissions in opposition to FDU's motion for summary judgment.

## II.    **Factual Background**[1]

O'Malley began working at FDU in 1989, when she was approximately 50 years old. [D.E. 1 ("Compl.") ¶ 10; D.E. 6 ("Ans.") ¶ 10; D.E. 63 ("Final Pretrial Order" or "FPTO") § 3, Stipulation of Facts ¶ 1.]  Throughout her time at FDU, she worked in several campus libraries. In 2003, at the request of the library director James Marcum, she was assigned to the Weiner Library.  [FPTO § 3, ¶¶ 2-3; D.E. 76-3, Ex. 1 to Pl. Opp'n to Mot. Summ. J., O'Malley Aff. ¶¶ 12-13.]  Before that, the parties agree that O'Malley had "worked alone and her supervisor was not present."  [FPTO § 3, ¶ 39.]  As of approximately 2006, O'Malley's immediate supervisor at the Weiner Library was Kathy Stein-Smith, although O'Malley contends that she (and others) did not receive notice that Stein-Smith and not Marcum was officially her supervisor.  [*See, e.g.*, *id.* ¶¶ 4, 6; D.E. 76-3, Ex. 8 to Pl. Opp. to Mot. Summ. J., Memo. from J. Marcum (Mar. 31, 2006); FPTO § 4, Pl.'s Contested Facts ¶¶ 16, 19-20.]  Stein-Smith had, O'Malley relates, previously been a peer.  [D.E. 76-3, Ex. 1 to Pl. Opp'n to Mot. Summ. J., O'Malley Aff. ¶¶ 26-28, 33.]  O'Malley claims that Marcum had given her favorable performance evaluations in 2003 and 2005 and had promoted her and given her additional responsibilities.  [*Id.* ¶¶ 14-16, 20.]

In contrast, O'Malley contends, her performance evaluations under Stein-Smith were poor.  [*See, e.g.*, FPTO § 3, ¶¶ 6-8.]  O'Malley describes Stein-Smith as constantly critical of her: among other things, she challenged O'Malley's use of vacation time, lack of coverage at the library reference desk, alleged insubordination, and general attitude.  [*See, e.g.*, *id.* ¶¶ 8-11.]  In O'Malley's version of events, from the very beginning, Stein-Smith embarked on a crusade to

---

[1] These facts are drawn from the pleadings, final pretrial order, and the parties' submissions with respect to FDU's motion for summary judgment.

make O'Malley's work environment miserable and hostile.  The record is abundantly clear that there was significant discord between Stein-Smith and O'Malley, and that O'Malley's attempts to bring her concerns to Marcum, Stein-Smith's supervisor, did not improve the situation.  For example, on May 22, 2008, O'Malley sent Marcum an email referencing a disagreement she had with Stein-Smith regarding a training program she wanted to attend. [D.E. 76-4, Ex. 19 to Pl. Opp'n to Mot. Summ. J., Email from D. O'Malley to J. Marcum.]  Marcum responded that "I cannot participate in your difficulties with Kathy.  She's your supervisor and you must work it out with her."  [*Id.*, Email from J. Marcum (May 23, 2008).]  O'Malley replied to Marcum in a lengthy email asking him to explain what he meant, and describing what she viewed as Stein-Smith's various shortcomings as a supervisor.  [*Id.*, Email from D. O'Malley to J. Marcum (June 9, 2008).]  O'Malley pleaded for Marcum to intervene, as he was "the supervisor's supervisor" and was "ultimately responsible for her actions," which, in O'Malley's view, included unfair treatment, abuse, and harassment.  [*Id.*]  She closed with a request to keep her email confidential. [*Id.*]

Marcum was blunt in his reply to that email, telling O'Malley that she was "extremely difficult to work with," argumentative, and unwilling to take direction, follow instructions, or accept responsibility for her role in creating conflicts.  [*Id.*, Email from J. Marcum (June 9, 2008, 08:28 a.m.).]  He "washed [his] hands of the matter and turned it over to [Stein-Smith]."  [*Id.*] Apparently Marcum forwarded the email chain to Stein-Smith, who emailed back to him describing O'Malley's message as "the most recent example of a pattern of gratuitous insults and unfounded insults that I endure verbally and in writing on a regular basis from Della."  [*Id.*, Email from K. Stein-Smith to J. Marcum (June 9, 2008, 10:57 a.m.).]  Stein-Smith asked Marcum to "take immediate action to end this pattern of abuse that I – and any reasonable person

– would consider a hostile working environment." [*Id.*]  Marcum responded that they would speak with "Ann" and "Rose," presumably in FDU's human resources ("HR") department, and that he supposed they would have to "'walk through' the process: meeting w/ her, give her a last chance, etc." [*Id.*, Email from J. Marcum (June 9, 2008, 11:41 a.m.).]

It appears that Marcum did precisely that.  That month Stein-Smith and Marcum contacted HR personnel about O'Malley's allegedly insubordinate conduct, and a meeting would involve them and O'Malley was planned for August 7, 2008.  [FPTO §3, ¶¶ 11-12.]  In the meantime, O'Malley filed a complaint about Stein-Smith with HR, on or about August 2, 2008, and sought to have a meeting about her issues with Stein-Smith before the scheduled August 7[2] meeting when her own performance would be the topic.[2]  [FPTO §3, ¶ 13-14; *see also* D.E. 76-3, Ex. 3, Pl. Opp'n to Mot. Summ. J., Discrimination/Harassment Complaint Form.] O'Malley contends that Valerie Adams ("Adams") of the Professional Administrative Senate ("PAS"),[3] encouraged her to file her complaint, assuring her that filing a complaint would not worsen O'Malley's situation and seeking to elicit written complaints from other affected library employees.  [FPTO § 4, Pl.'s Contested Facts ¶¶ 110-116.]  The record indicates that O'Malley had sought Adams's assistance at least as early as mid-May 2008, when Adams indicated in an

---

[2] O'Malley contends that she actually began her complaint process earlier, in June or July 2008.  [*See* FPTO § 4, Pl.'s Contested Facts ¶¶ 54, 126; D.E. 76, Pl. Br. 23, 28; *see also* DE 76-3, Ex. 9 to Pl. Opp'n to Mot. Summ. J., Memo. from "Della" to "Ann" (May 4, 2008) (suggesting O'Malley may have informally complained to HR in May 2008).]  O'Malley thereby suggests, apparently for the purposes of her retaliation claim, that her complaint predated the initiation of the disciplinary process with respect to her own employment.  The significance of this, or lack thereof, is discussed in Part III.B.2.c.

[3] PAS is also called the "Professional Administrative Service" in the record, and the parties agree O'Malley was a member thereof.  [FPTO § 3, ¶ 23.]  According to O'Malley, PAS is a "representative and advisor" to FDU's non-union employees.  [*Id.* § 4, Pl.'s Contested Facts ¶ 104.]

email that she would speak to Ann DeMeskey and Rose D'Ambrosio of HR. [*See* D.E. 76-6, Ex. 37 to Pl. Opp'n to Mot. Summ. J., Email from V. Adams (May 12, 2008).]

On July 9, 2008, approximately a month after their May 22, 2008 to June 9, 2008 email exchange described earlier, Stein-Smith reported to Marcum that O'Malley had challenged her on two separate occasions that day, acting disrespectfully and in an insubordinate manner. [D.E. 76-4, Ex. 20 to Pl. Opp'n to Mot. Summ. J., Email from K. Stein-Smith to J. Marcum (July 9, 2008).] She copied DeMeskey and D'Ambrosio of the HR department. D'Ambrosio responded that O'Malley needed to be disciplined and provided a link to the requisite paperwork. [*Id.*, Email from R. D'Ambrosio to K. Stein-Smith and J. Marcum (July 9, 2008).]

Meetings with respect to O'Malley's performance were held on August 7, 2008 and September 30, 2008, with O'Malley, Stein-Smith, and DeMeskey of HR in attendance. [FPTO § 3, ¶¶ 16-17.] Adams also attended the August 2008 meeting and Karen Lewis the September 2008 meeting; both were members of PAS and apparently were there to support O'Malley. [*See* FPTO § 3, ¶¶ 16-17; Compl. ¶ 17 n.16.] O'Malley claims Stein-Smith's participation in these meetings and related discussions – apparently part of a disciplinary process at FDU – constituted retaliation for her prior complaints about Stein-Smith's behavior,[4] and she accuses FDU of failing to provide a mechanism for her to bypass a supervisor allegedly engaging in discriminatory and harassing conduct in filing a complaint about that supervisor. [*See, e.g.*, FPTO § 4, Pl.'s Contested Facts, ¶¶ 51-54.]

---

[4] There seems to have been confusion, at least on O'Malley's part, as to the purpose of the August 2008 meeting. O'Malley appears to have viewed it as an opportunity for her own complaint to be discussed, while FDU viewed it as part of an employee disciplinary procedure. [*See* FPTO § 3, ¶¶ 16-17; *see also* D.E. 76-7, Ex. 43 to Pl. Opp'n to Mot. Summ. J., Email from D. O'Malley to V. Adams (Aug. 28, 2008).] Again, the relevance of this depends upon whether O'Malley was engaging in "protected activity," which is discussed in Part III.B.2.c.

On January 21, 2009, a third meeting was held among O'Malley, Stein-Smith, DeMeskey, and Lewis, and it ended with O'Malley's termination. [FPTO § 3, ¶¶ 19-20.] O'Malley was 69 years old at the time. [*Id.* ¶ 1.] The stated reasons for O'Malley's termination were insubordination and poor performance. [*Id.* ¶ 30.] After she was terminated, O'Malley allegedly made certain representations to another person regarding whether he should exhibit his work at the library as planned, without telling him that she no longer worked at FDU. [*Id.* ¶ 34; *see also* D.E. 76-4, Ex. 23 to Pl. Opp'n to Mot. Summ. J., Letter from R. D'Ambrosio to D. O'Malley (Feb. 3, 2009); D.E. 76-4, Ex. 25, Email from A. DeMeskey to R. D'Ambrosio (Jan. 26, 2009).] O'Malley herself ultimately attended the exhibit. According to a letter D'Ambrosio sent her afterward, O'Malley was seen in employee-only areas that day. [D.E. 76-4, Ex. 23 to Pl. Opp'n to Mot. Summ. J., Letter from R. D'Ambrosio to D. O'Malley (Feb. 3, 2009).] D'Ambrosio's letter stated that O'Malley had misrepresented herself as an FDU employee, and had improperly accessed employee-only areas while attending the exhibit, and that if she continued to do either, she would be banned from the campus. [*Id.*]

O'Malley filed the instant suit against FDU on November 24, 2010. [*See generally* Compl.] She claims that FDU discriminated against her on the basis of her age, sex, and national origin, by aiding Stein-Smith in creating and maintaining a hostile work environment and harassing O'Malley. [Compl. at 1.] O'Malley further claims that by virtue of Stein-Smith's mistreatment and how her own complaints were handled, she was denied the benefits of FDU policies. [Compl. at 1 & ¶ 1.] The latter contentions appear to form the basis of O'Malley's claims for retaliation, breach of contract, and fraud (which O'Malley pleads using terms such as misrepresentation and detrimental reliance). With respect to this set of claims, O'Malley contends that Stein-Smith was impermissibly informed of O'Malley's internal complaints against

her, and subsequently intruded upon the process for resolving them, in contravention of the common law requirement that an employee be able to circumvent an allegedly harassing supervisor in lodging complaints. [*See, e.g.*, Compl. ¶¶ 2-3.]

The complaint is very long (59 pages and nearly 150 paragraphs), and does not lend itself to a ready overview. However, a fair reading establishes that O'Malley makes four claims supported by factual assertions thus: Count 1 charges that FDU, through Stein-Smith, discriminated and retaliated against O'Malley in violation of the ADEA, and subjected her to a hostile work environment. [Compl. ¶¶ 92-97.] Count 2 charges that FDU subjected her to discrimination, harassment and a hostile work environment, and retaliation in violation of Title VII. [Compl. ¶¶ 99-107.][5]

Count 3 charges that FDU breached the contractual promises it purportedly made to O'Malley (and other employees) in the FDU Employee Handbook; specifically, that "if she availed herself of the FDU dispute resolution policy she would not experience any retribution." [Compl. ¶¶ 108-118.] In this regard, O'Malley claims that FDU cannot argue that she was an employee at will. [Compl. ¶ 110.] Count 3 also alleges that, even in the absence of a finding that a contractual promise existed, O'Malley was induced to, and did, detrimentally rely upon "FDU's performance consistent with the policy," when she filed a complaint relating to Stein-Smith's behavior. [Compl. ¶ 117.]

Count 4, which appears to be pleaded in the alternative, charges that FDU's "agents" made fraudulent and misleading statements and misrepresentations intended to induce O'Malley to rely on them, including statements about her termination appeal rights, statements Stein-Smith

---

[5] O'Malley submitted an "errata" to the complaint on March 8, 2011, containing a substituted page 49, which includes portions of paragraphs 106 and 107. [*See* D.E. 5.] Though she cites no authority permitting a party to submit an "errata" document correcting typographical errors in a previously filed document and substituting pages in such a document, the Court has considered it in the interest of completeness.

made to and about O'Malley, various "promises" FDU made in its policies, and whether

O'Malley should have been told after her termination that she should file a complaint with the

EEOC. [Compl. ¶¶ 119-132.]

FDU answered the complaint on April 11, 2011, and asserted 26 affirmative defenses.

[*See generally* Ans.] Discovery proceeded, and on February 22, 2013, then-Magistrate Judge

Shwartz entered the Final Pretrial Order. [D.E. 63.]

On March 18, 2013, FDU filed a motion for summary judgment on all claims. [D.E. 66.]

FDU argues that O'Malley cannot establish a case of discrimination or harassment based on age,

national origin, or sex discrimination, or a case of retaliation. [D.E. 66-1, Summ. J. Br.] FDU

further argues that O'Malley's contract-based claim, which it calls a claim for breach of implied

contract, must fail, and that she cannot sustain a claim for fraud. [*Id.*] Finally, FDU contends

that O'Malley cannot maintain a punitive damages claim. [*Id.*]

On March 19, 2013 – the day after the Court-ordered deadline to file summary judgment

motions, which reflected an extension requested by plaintiff [D.E. 65] – O'Malley filed a request

for more time in order to file her own motion for summary judgment. FDU opposed. [D.E. 68;

D.E. 67.] The request was denied. [D.E. 69.] On March 26, 2013, O'Malley filed her brief in

opposition to FDU's summary judgment motion [D.E. 72], which the Clerk's Office directed be

"disregarded" because counsel filed it using an incorrect event code. O'Malley filed a modified

version of the brief on March 27, 2013, with a cover letter from counsel claiming that he had

encountered serious technical difficulties in filing his opposition papers. [D.E. 73]. Contrary to

Local Civil Rule 56.1, neither O'Malley's March 26 nor March 27 submissions was

accompanied by a statement of facts responsive to the statement provided by FDU in support of

its motion for summary judgment.

On April 3, 2013, FDU's counsel filed a letter indicating that O'Malley's attorney intended to file yet another brief in opposition to FDU's motion for summary judgment on April 5, 2013, the same day FDU's reply brief was due, because of more computer problems. [D.E. 74.] FDU opposed this attempt to file a revised brief, noting that the deadlines for filing dispositive motions had been repeatedly adjourned, that the Court's then-most-recent order contemplated no further extensions, and that a new filing would be prejudicial. [*See id.*] Magistrate Judge Shwartz, recognizing, *inter alia*, that O'Malley asserted that her brief may be missing certain arguments, issued an order on April 4, 2013, permitting O'Malley to file her complete opposition brief by 5:00 p.m. on April 5, 2013. [D.E. 75.] Judge Shwartz warned O'Malley that if she did not file her brief by the new deadline, she would be bound by her March 27, 2013 brief and no further submissions would be permitted. [*Id.*] If O'Malley did file the opposition brief by the deadline, the March 27 brief would be stricken and could not be relied upon for any purpose. [*Id.*] FDU was given until April 29, 2013 to file its reply brief. [*Id.*]

Notwithstanding, O'Malley's revised opposition brief was filed a day late, on April 6, 2013. [*See* D.E. 76.] This brief was accompanied by a statement of facts and a number of exhibits. [*See* D.E. 76-1 to 76-11.] The re-filed brief is overlong, contrary to Local Civil Rule 7.2, and contains excessive footnotes, contrary to the Court's published preferences. [*See* D.E. 77.] The statement of facts fails to comply with Local Civil Rule 56.1. [*Id.*] In view of these deficiencies, and because it was out of time, the Court issued an order striking O'Malley's April 6 submission. [*Id.*]

On April 22, 2013, O'Malley filed a motion under Local Civil Rule 7.1(i) for reconsideration on the grounds that the Court did not have certain facts before it and that striking the brief was too harsh a sanction. [D.E. 78 ("Recon. Br.").]

On April 29, 2013, FDU timely filed its reply brief in support of its motion for summary judgment. [D.E. 79 ("Reply Br.").] FDU also filed a supplemental statement of material facts and additional exhibits. Of particular note, FDU's reply brief argues that O'Malley failed to properly oppose its motion for summary judgment as to the common-law claims, thus warranting their dismissal. [Reply Br. 3.] Later, FDU filed timely opposition to O'Malley's motion for reconsideration and asked for attorneys' fees and costs in connection with preparing the opposition. [D.E. 81 ("Recon. Opp. Br.").] Should the Court grant the reconsideration motion, FDU requested that O'Malley be bound by the April 6 submission and precluded from filing yet another opposition. [*Id.* at 10.]

On May 13, 2013, O'Malley filed a response to FDU's supplemental statement of material facts. [D.E. 82.] On May 17, 2013, FDU's counsel objected to this submission as an improper sur-reply. [D.E. 83.] Oral argument on FDU's motion for summary judgment and O'Malley's motion for reconsideration was held on November 26, 2013. [D.E. 88.] On December 4, 2013, FDU filed a letter in response to certain of the Court's inquiries at oral argument, specifically providing support for FDU's assertions at argument that O'Malley had ultimately opted not to pursue her own internal complaint against Stein-Smith. [*See* D.E. 89.] With the letter, FDU included two additional exhibits, stating that it would have included them in a reply to O'Malley's April 6, 2013 submission. [*Id.*][6]

---

[6] The second of these exhibits is identical to Exhibit 45 to O'Malley's April 6, 2013 submission in opposition to FDU's motion for summary judgment. The first is an email exchange between O'Malley and Adams, in which O'Malley expresses her displeasure at how the August 2008 meeting proceeded with respect to her own complaint, and Adams, in response, expresses her disagreement with O'Malley's position.

## III.  <u>Analysis</u>

### A.  Motion for Reconsideration

O'Malley contends that reconsideration of the order striking her submission is warranted because the Court did not have the benefit of certain facts and a lesser sanction would have been appropriate.  [*See* Recon. Br. 1-2.]  She admits that her April 6, 2013 submission was not timely, but claims that this was beyond her control because counsel was still recovering allegedly corrupted files and had once again encountered difficulties when attempting to file them electronically.  [*Id.* at 4-7.]  Further, O'Malley contends that the filing was "but a few hours late" and that therefore "there was no significant prejudice to defendant," which still had several weeks to file its reply brief, while on the other hand O'Malley's case would suffer significantly if her submission remained stricken.  [*Id.* at 7-8.]  O'Malley indicates that, had she had an opportunity to file her request or response to FDU's April 3, 2013 letter to the Court, she would have explained the difficulties in "rebuilding" the files.  [*Id.* at 6, 9-11.]  O'Malley also offers explanations as to why the re-filed briefing failed to comply with the Local Rules and with this Court's published preferences.  [*Id.* at 12-14.]

FDU opposes O'Malley's motion as "a desperate attempt to be provided another chance to embellish upon her opposition filed on March 27, 2013."  [*See* Recon. Opp. Br. 1.]  In particular, FDU continues, O'Malley has pointed to no information – factual or legal – that the Court "overlooked" in issuing its order and no new evidence, and should have advised the Court before the April 5 deadline expired that it could not be met rather than presuming her late filing would be accepted.  [*Id.* at 6-8.]  FDU asserts that it would be unduly prejudiced if the Court granted reconsideration of the order striking O'Malley's April 6 submission, insofar as it would have to re-draft its reply brief and divert attention from preparing its trial strategy.  [*Id.* at 8-9.]

While FDU asks the Court to deny O'Malley's motion, it seeks in the alternative to require that she be bound by her April 6 submission, rather than be permitted to file yet another opposition. [*Id.* at 10.]

Also, under 28 U.S.C. § 1927,[7] FDU requests attorney's fees and costs incurred in preparing its opposition, in view of what it deems a frivolous motion. [*Id.* at 10-11.]

Under Local Civil Rule 7.1(i), a motion for reconsideration must be filed "within 14 days after the entry of the order or judgment on the original motion." The notice of motion must be accompanied by a supporting brief "setting forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked." L. Civ. R. 7.1(i).

The motion is intended to be "an extremely limited procedural vehicle." *CPS Medmanagement LLC v. Bergen Reg'l Med. Ctr.*, 940 F. Supp. 2d 141, 167 (D.N.J. 2013) (McNulty, J.) (quoting *Tehan v. Disability Mgmt. Servs., Inc.*, 111 F. Supp. 2d 542, 549 (D.N.J. 2000)) (internal quotation marks omitted). Granting a motion for reconsideration requires that "(1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice." *Id.* (citing *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *Beety-Monticelli v. Comm'r of Soc. Sec.*, 343 F. App'x 743, 747 (3d Cir. 2009) (nonprecedential).). In practice, the test is a strict one: "[u]nless a court has truly failed to consider pertinent authorities or evidence that could not with reasonable diligence have been presented earlier, a motion to reconsider a decision (even one that may contain an error) is generally futile." *Id.* at 168. *See also PDL Biopharma, Inc. v. Sun Pharm. Indus., Ltd.*, 633 F.

---

[7] 28 U.S.C. § 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Supp. 2d 207, 208 (D.N.J. 2009) (Hayden, J.) ("'Relief by way of a motion for reargument is an extraordinary remedy that is to be granted very sparingly.'") (quoting *Capell v. Lowe's Home Imp. of Toms River*, No. 03-3208,  2005 WL 2373415, at *2 (D.N.J. Sept. 27, 2005).

O'Malley's arguments fail to satisfy this stringent standard.  At bottom, she simply contends that her counsel needed more time to complete the filing because he encountered technical difficulties.  Judge Shwartz's April 4, 2013 order [D.E. 75] explicitly recognized counsel's asserted need for additional time in view of allegedly corrupted electronic files, and granted an extension.  O'Malley's motion for reconsideration frames as "new" the fact that counsel ended up needing still more time.  This is not "new" matter within the meaning of Local Civil Rule 7.1(i); counsel has repeatedly invoked the need for more time.  Moreover, assuming counsel was encountering a fresh new set of difficulties as opposed to the same ones, the proper course was to alert the Court and FDU that the papers would be late instead of waiting until the deadline passed.

Although the Court would be warranted in denying the motion, in the interest of judicial efficiency, the Court indicated to the parties at oral argument that it fully reviewed O'Malley's April 6, 2013 submission, including its exhibits.  Based on that review, the Court is satisfied that FDU was not prejudiced by O'Malley's filing and that entertaining the full record is appropriate when, as here, a merits decision is called for.  Accordingly, the Court **GRANTS** O'Malley's motion for reconsideration.

### B.  Motion for Summary Judgment

#### 1.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a). A "material" fact is one that "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "To demonstrate that no material facts are in dispute, the moving party must show that the non-moving party has failed to establish one or more essential elements of his or her case." *Id.* In evaluating the parties' arguments, the court must "view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor." *Id.* However, "'a party will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial,'" and "'[o]nly evidence sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case merits consideration beyond the Rule 56 stage.'" *Lauren W. ex rel Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007) (second alteration in original) (quoting *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (citation and internal quotation marks omitted).

### 2. ADEA and Title VII Claims

O'Malley has raised claims under the ADEA and under Title VII, for alleged discrimination and harassment (including a hostile work environment) on the basis of her age, her sex, and her Chinese national origin, and for retaliation. Each is addressed in turn.

#### a. ***ADEA "Status" Claims***

The ADEA makes it unlawful for an employer to, *inter alia*, "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). It is also unlawful for the employer to "limit, segregate, or classify" employees in a way that would "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." *Id.* § 623(a)(2).

In the absence of direct evidence of discrimination, a claim for discrimination under the ADEA (as well as under Title VII, as discussed below) is evaluated by a three-step test. *See Smith v. City of Allentown*, 589 F.3d 684, 689-91 (3d Cir. 2009); *see also Ptasznik v. Univ. of Pennsylvania*, 523 F. App'x 156, 159 (3d Cir. 2013) (nonprecedential) (noting that proof methods are direct evidence of discrimination or indirect evidence meeting three-step test). This test, developed in the Title VII context in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires the plaintiff first to demonstrate a *prima facie* case of discrimination. *Smith*, 589 F.3d at 689. If shown, "the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action." *Id.* at 690. "If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination." *Id.* The plaintiff always bears the burden of persuasion. *Id.* Further, part of the plaintiff's burden of persuasion involves proving "that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176-77, 180 (2009).

"To establish a prima facie case of age discrimination under the ADEA, [a plaintiff] must make a showing that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of

discriminatory animus." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). "To establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'" *Id.* (alteration in original) (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)). Thus, if the plaintiff does not raise a genuine dispute of material fact as to even one of the required elements, "she has not met her initial burden, and summary judgment is properly granted for the defendant." *Id.*

O'Malley has not presented sufficient evidence for her ADEA claim to survive even the first step of the *McDonnell Douglas* test, that she make out a *prima facie* case of age discrimination. While she meets the age requirements and FDU terminated her employment, the record on summary judgment is rife with material indicating that her performance was deficient and that FDU made its termination decision based on these deficiencies. Further, even if she is held to have raised a genuine dispute as to that question, she has provided no evidence that she was replaced by another, younger employee such that the Court could infer that discriminatory animus was at work – nor has she produced evidence that younger employees were treated more favorably than she was. To the contrary, O'Malley admits that individuals approximately her age and older remain employed at FDU. [*See* FPTO § 4, Pl.'s Contested Facts ¶ 36 ("Employees, as a fact, at defendant often work well into their 70's."); *see also* Compl. ¶ 97 n.31 (in support of demand for future pay, stating that "though [O'Malley] was 69, at FDU there were a number of professional employees she dealt with even significantly older than [her].")] O'Malley even concedes that DeMeskey, in HR, was one such employee. [FPTO § 4, Pl.'s Contested Facts ¶ 38.] She also alleges that Stein-Smith harassed three of her younger co-workers, two men and a woman. [FPTO § 3, ¶¶ 21-22, 24.] In her deposition, she described

them as in the forties- to sixties-age range, as was Stein-Smith.  [Certification of Robyn L.

Aversa in Supp. of Mot. Summ. J. ("Aversa Cert."), Ex. A, O'Malley Dep. at 59:8-16.]  She does

not, however, provide evidence that there were other employees who were treated *better*.  In

O'Malley's complaint (¶ 48) she states that a younger non-Asian male received three months'

severance a few years before she was terminated, while she got paid only until the end of the

month during which she was terminated, calling this discrimination and retaliation.  The

allegation exists in a vacuum; the inference to be drawn is purely speculative; for purposes of

summary judgment, the fact, assuming it is true, does not constitute evidence to support her

claim.  In short, the record simply does not permit an inference of age discrimination.

O'Malley's internal complaint to FDU regarding Stein-Smith's treatment likewise fails to

support a conclusion that O'Malley was – or even that she felt she was – being treated poorly due

to her age (or, for that matter, her sex or national origin).  O'Malley makes no such allegations in

the form complaint, and, although there is space for a complainant to check boxes indicating the

reasons he or she believes he or she was discriminated against, with options for race, sex,

religion, national origin, retaliation, age, disability, and other, O'Malley checked only

"retaliation," and "other," which she defined as "abusive and hostile working environment."

She did not check off age, sex, or national origin.  [D.E. 76-3, Ex. 3, Pl. Opp'n to Mot. Summ. J.,

Discrimination/Harassment Complaint Form.]  The attachment to the form complaint containing

O'Malley's narrative describes how, for example, Stein-Smith allegedly rudely interrupted a

telephone call between O'Malley and Adams, and, how she earlier gave O'Malley an artificially

low, factually unsupported negative performance evaluation.  [*Id.*]  Nor would Stein-Smith

accede to a suggestion of having departmental meetings.  [*Id.*]  The complaint closes with

O'Malley's request that Stein-Smith communicate her expectations better, that Marcum be

tasked with evaluating O'Malley's performance, and that Stein-Smith treat her staff with more respect. [*Id.*] Far from complaining about discriminatory treatment on the basis of protected characteristics, O'Malley appears to be grouping herself with all other members of the department chafing under a disliked supervisor. [*See id.*]

Further, even if the burden of production were to shift to her employer to proffer a legitimate, non-discriminatory reason for terminating her, FDU has done that. Aside from the negative performance evaluations done by Stein-Smith, which O'Malley challenges as a product of Stein-Smith's alleged crusade of retaliation, O'Malley's generally disrespectful attitude towards Marcum, Stein-Smith, and others jumps out of numerous emails in the summary judgment record, as does her disregard or distaste for her assigned responsibilities. [*See, e.g.*, Aversa Cert., Ex. E, Email from D. Daniele to J. Marcum (Dec. 7, 2006) (library employee resigning from library committee because she "totally resented this type of attitude that was shown to [her, by O'Malley]"; *id.*, Ex. F, Email from K. Stein-Smith to D. O'Malley (Jan. 22, 2007) (discussing O'Malley's failure to staff reference desk and her notion that a phone conversation she was having was "more important") and Email from D. O'Malley to K. Stein-Smith (Jan. 23, 2007) (taking issue with Stein-Smith's characterization of her response, but suggesting that "it is important for us as professionals to work together and to help one another instead of being chained to a chair and babysitting the desk no matter what are the needs and circumstances of the moment" and "we really should discuss what is the best way to serve our students, the faculty and other users"); *id.*, Ex. G, Emails from K. Stein-Smith to J. Marcum (Mar. 6 2007; Mar. 7, 2007) (discussing professors' dissatisfaction with classes taught by O'Malley).] *Accord Verma v. Univ. of Pennsylvania*, 533 F. App'x 115, 118 (3d Cir. 2013) (nonprecedential) (finding, in Title VII case alleging race and national origin discrimination, that

employer "proffered a legitimate, non-discriminatory reason for terminating [employee] – namely, her ongoing conflicts with co-workers and supervisors, repeated insubordination, and poor work performance").

Some points made at oral argument merit brief mention. When the Court asked what evidence in the record would permit a reasonable juror to conclude that FDU discriminated against O'Malley on the basis of her age, sex, or national origin and that discriminatory animus motivated her termination, O'Malley's lawyer cited to her complaint to HR, but later had to concede that such allegations were absent from it. He further cited a November 14, 2007 email exchange between Stein-Smith and Marcum in which Stein-Smith reports (with apparent copy to O'Malley) that O'Malley attended a workshop, contrary to Stein-Smith's instructions and without permission, and recommends discipline for the purported "instance of insubordination." [D.E. 76-4, Ex. 16 to Pl. Opp'n to Mot. Summ. J., Email from K. Stein-Smith to J. Marcum (Nov. 14, 2007).] Marcum responded as follows:

> I don't think this is firm ground on which to fight this fight. Just rewrite it to her, as act of insub [sic], copy me, and put in her file. We need more "paper trail" to initiate the "last chance" procedures.

[*Id.*, Email from J. Marcum (Nov. 14, 2007).] This email does not provide any support for a conclusion that FDU targeted O'Malley or made decisions about her performance based on any protected characteristic. Marcum was within his rights to paper the file if he was pursuing termination – the relevant issue was whether the paper trail was insufficient or somehow corrupt, or undertaken with discriminatory animus. This email merely reflects that Marcum was being measured. Counsel also pointed to a July 9, 2008 email from D'Ambrosio to Stein-Smith and Marcum, copying DeMeskey, stating that O'Malley needed to be disciplined for an incident in which she purportedly argued with Stein-Smith about covering the reference desk and doing her

work.  [D.E. 76-4, Ex. 20 to Pl. Opp'n to Mot. Summ. J., Email from R. D'Ambrosio to K. Stein-Smith and J. Marcum (July 9, 2008).]  Counsel attacked the last sentence of the email – "[i]f [O'Malley] has been previously disciplined in writing for insubordination, please provide me with the details" – and the timing of it – 8:36 p.m., after business hours and allegedly just before O'Malley was to file her own complaint with HR about Stein-Smith.  [*Id.*]  Counsel suggested that this statement, and the timing of the email, exposed FDU's plot to create a negative record of O'Malley's performance.  But from those facts, the Court is unable to discern an inference that FDU's actions in any way involved O'Malley's age (or, as relevant to the Title VII claims, her sex or national origin).

O'Malley's arguments in court and citations to record evidence fail to raise a genuine dispute of material fact on her ADEA claims (and, as will be seen below, her Title VII claims) sufficient to defeat summary judgment in FDU's favor.  At bottom, she has simply failed to provide evidence from which a reasonable factfinder could find in her favor on the ADEA claim.  Accordingly, FDU is granted summary judgment on this claim.

**b. *Title VII "Status" Claims***

O'Malley has also alleged that she was discriminated against on the basis of her Chinese national origin and her sex, in violation of Title VII.  As further discussed below, the shortcomings in O'Malley's ADEA claims also doom her Title VII claims.  Akin to the ADEA, Title VII protects against discrimination on the basis of protected characteristics.  Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Employers likewise cannot "limit, segregate, or classify [their] employees . . . in any way which would deprive or tend to deprive any individual

of employment opportunities or otherwise adversely affect" employment status on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(2).

Like claims for age discrimination, claims of discrimination under Title VII are generally evaluated using the *McDonnell Douglas* test. *Scheidemantle*, 470 F.3d at 539. *See also Burton*, 707 F.3d at 425-26 (noting that *McDonnell Douglas* framework is used to evaluate Title VII and age discrimination claims when plaintiff has not provided direct evidence of discrimination). The first step is whether the plaintiff can make out a *prima facie* case of discrimination. *Scheidemantle*, 470 F.3d at 539. Here that inquiry involves whether O'Malley demonstrates that "(a) she was a member of a protected class, (b) she was qualified for the . . . job . . ., and (c) another, not in the protected class, was treated more favorably." *Id.* The last element is also satisfied by "showing that the adverse employment action 'occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Burton*, 707 F.3d at 426 (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). As with ADEA claims, if a plaintiff fails to raise a genuine dispute of material fact as to any of the required elements, summary judgment is properly granted in the defendant's favor. *Id.*

If O'Malley satisfies this first step, the burden of production shifts to FDU to establish a legitimate non-discriminatory reason for the adverse employment action it took. *Scheidemantle*, 470 F.3d at 539. If FDU does so, the third step of the *McDonnell Douglas* test is whether the "proffered reason is merely a pretext for actual discrimination." *Id.* In the Title VII context, a showing of pretext is made by the plaintiff providing evidence allowing a factfinder to "reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

O'Malley's evidence does not establish even a *prima facie* case of discrimination based on sex or national origin. As indicated earlier, the evidence does not establish, and indeed it casts substantial doubt, that O'Malley was qualified for her position. Further, even assuming she were, O'Malley provides no evidence that non-Chinese and male employees were treated more favorably than she was. Of the three other library employees O'Malley testified about as being treated badly by Stein-Smith, two were males. [FPTO § 3, ¶¶ 21-22, 24.] O'Malley also testified about a male audiovisual technician who was treated poorly. [Aversa Cert., Ex. A, O'Malley Dep. 62:8-17.] She testified further that one of the employees – a male – whom she named as having been unfairly treated and discriminated against by Stein-Smith was not Asian. [*Id.* at 183:16-17.] Against this dearth of evidence of differential treatment, O'Malley offers only her own unsupported view that she experienced an adverse employment action due to her sex and national origin (and her age, as discussed earlier). For example, O'Malley claims that, because her performance evaluation forms allegedly lacked factual support, "her termination could only be based on her age, her sex or her Chinese American heritage or retaliation for her filing a grievance." [Compl. ¶ 4.] [*See also* Compl. ¶ 14 ("The repetition of this, created the hostile work environment based on harassment of Plaintiff [the only Chinese American librarian reporting to Ms. Stein-Smith in the library and likely the only one of her age].")); Aversa Cert., Ex. A, O'Malley Dep. at 93:18-20 ("Maybe I am Chinese and she think she can accuse me of certain things. I don't know. She think we are inferior because we are minority.").] This is bald conclusory argument, and once again, it is significant that her internal complaint to HR – made at a time when arguably she was intent on bringing matters to a head – fails to make any reference to differential treatment based on sex or national origin.

Likewise, O'Malley fails to point to any messages or statements coming *from* anyone at FDU that even suggest that sex or national origin played a role in the conduct she complains about. The closest she comes is a naked assertion in her statement of contested facts submitted as part of the final pretrial order, that an evaluation by a previous supervisor "inferentially noted" her Chinese heritage "when [the previous supervisor] focused on her writing English as deficient." [FPTO § 4, Pl.'s Contested Facts ¶ 242.] In the next breath, however, O'Malley claims that over the longer term, "her Chinese heritage had not been raised as a significant need for improvement" [*id.* ¶ 243], and she also repeatedly claims that evaluations prior to those done by Stein-Smith were positive [*see, e.g.*, *id.* ¶¶ 39, 43, 47]. Thus, by O'Malley's own admission, even if her Chinese national origin were referenced in a prior evaluation (which itself is fatally vague as proof of anything because O'Malley provides no context or objective evidence in support), it did not affect her employment status. O'Malley also suggested in her deposition that other library employees were treated poorly, and that

> Of course, I'm Chinese. I'm minority. Like Kathy Stein-Smith may be even furthermore want to pick on me, okay?

[Aversa Cert., Ex. A, O'Malley Dep. 52:7-9.] As with her vague statement about the previous supervisor's evaluation, however, this is an assertion with no context or evidence that raises an inference that Stein-Smith treated O'Malley poorly because she is Chinese as opposed to another, non-discriminatory reason – such as, for example, O'Malley's poor performance on the job and open resistance to supervision.

Indeed, as with her age discrimination claim, all O'Malley has offered is a recital of alleged mistreatment by her supervisor, and a list of her characteristics – age, Chinese origin, and gender – that under federal law may not be the basis for adverse employment actions. What O'Malley fails to do, however, is to provide any evidence to support the inference she wishes to

draw – that the adverse employment action came about *because* of those characteristics. Worse, other than saying in so many words, "what else could it be?" O'Malley failed in her voluminous email correspondence and internal complaint to claim discriminatory intent behind the conduct she found to be egregious.

O'Malley does suggest that her Chinese heritage resulted in certain differences between her behavior and how native-born or -raised Americans behave, including differences in her communication style (in O'Malley's phrasing, she has a style that is blunt, or direct).[8] Therefore, she infers, punishing her or treating her differently based on her style of communication was tantamount to doing so because of her national origin. But taken as a whole, the record, and in particular the many detailed, cogent messages O'Malley directed at her supervisors and others, including her supporters like Adams, belie her argument that she could only communicate in one particular fashion or that she was ill equipped to communicate in a manner appropriate to her audience in the workplace, because of her Chinese upbringing. [*Compare, e.g.*, D.E. 76-3, Ex. 9 to Pl. Opp'n to Mot. Summ. J., Memo. from D. O'Malley to "Ann" (May 4, 2008) *with* Aversa Cert., Ex. H, Email from D. O'Malley to K. Stein-Smith (Feb. 8, 2008).] In this regard it is telling that Adams, who was friendly toward O'Malley and wrote her an email exhorting her to simply do her job, does not identify any triggering characteristics in O'Malley that would

---

[8] *See, e.g.*, Aversa Cert., Ex. A, O'Malley Dep. at 118:9-16 ("Q: Do you think that's an appropriate way to speak to your supervisor? A: Please, I'm Chinese, okay? I am a minority, okay? And I try to do the best I can to express my point of view. I make a suggestion. Unless you are discriminate because I am Chinese. I don't say anything wrong with that. People read full, understand what they mean."); *Id.* at 122:2-4 (A: "Well, I'm Chinese so I have Chinese custom way of express. Maybe too strong for you. We want to say directly."); FPTO § 4, Pl.'s Contested Facts ¶ 232 ("She was a woman, she was older, and she was Asian. Raised in another culture until she was a college student, she came to the United States as an Asian she saw life differently and expressed herself as a Chinese person would."); *see also* D.E. 76-6, Ex. 42 to Pl. Opp'n to Mot. Summ. J., Memo. to J. Marcum ("I may not speak English as eloquently as a native born American, but I am a hard worker with a strong work ethic.").

support an inference that she was viewed as different because of her national origin. [*See* D.E. 76-6, Ex. 45 to Pl. Opp'n to Mot. Summ. J., Email from V. Adams to D. O'Malley (Sept. 17, 2008).]

And while national origin discrimination is defined broadly to include "denial of equal employment opportunity . . . because an individual has the physical, cultural or linguistic characteristics of a national origin group," 29 C.F.R. § 1606.1, O'Malley fails to provide support for the idea that the conduct that her employer found inappropriate – challenging her supervisor's management style, arguing over the supervisor's decisions about staffing, offering unsolicited and unwanted direction to her supervisor, seeking to go over her supervisor's head, among other things – and that her performance deficiencies – such as offering unsatisfactory classes to the public and failing to follow vacation policies – had any connection to traits or characteristics associated with persons of Chinese background.

Accordingly, summary judgment in favor of FDU is likewise appropriate as to O'Malley's sex-based discrimination and national origin discrimination claims under Title VII.[9]

_____

[9] Unlike in the ADEA context, a but-for causal relationship is not required for a Title VII plaintiff to prove his or her case; that is, the impermissible reason need only be a motivating factor for the adverse employment action. 42 U.S.C. § 2000e-2(m); *see also Gross*, 557 U.S. at 174 ("Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor."). Thus, an alternative to the *McDonnell Douglas* framework in the Title VII context is a "mixed-motives" theory. *See, e.g.*, *Greenawalt v. Clarion Cnty.*, 459 F. App'x 165, 168-69 (3d Cir. 2012) (nonprecedential) (discussing the plaintiff's "three theories of discrimination"). Another method of proof is the "subordinate-bias, or 'cat's paw,' theory of discrimination," in which a plaintiff shows that one "'exhibiting discriminatory animus influenced or participated in the decision to terminate.'" *Id.* at 169 (quoting *Abramson v. Wm. Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001)). As noted, the record fails to establish that O'Malley's sex or national origin played a role in her termination, or that anyone at FDU involved in O'Malley's termination harbored discriminatory animus. Thus, under these alternative proof schemes, O'Malley's claim would still fail.

### c. *__Retaliation Claims__*

The ADEA and Title VII both prohibit retaliation against employees for engaging in activity protected under the respective statutory schemes. The ADEA prohibits employers from discriminating against an employee because he or she "has opposed any practice made unlawful by [section 623 of the ADEA]," or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA. 29 U.S.C. § 623(d). Likewise, Title VII prohibits retaliation by making it unlawful for employers to discriminate against an employee on the basis that he opposed an unlawful employment practice, or on the basis that the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

The *McDonnell Douglas* test provides the framework for evaluating retaliation claims where no direct evidence is provided. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) (Title VII case); *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (ADEA case). Establishing a *prima facie* case of retaliation requires a plaintiff to demonstrate that (1) he or she "engaged in a protected employment activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson v. William Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001) (footnote omitted) (Title VII); *see also Fasold*, 409 F.3d at 188 (ADEA). With respect to the first prong, whether the employee is invoking the protection of the "participation" or the "opposition" parts of the Title VII statute, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore*, 461 F.3d at 341 (case involving opposition clause). *See also Klastow v. Newtown Friends Sch.*, 515 F. App'x 130, 132 (3d Cir.

2013) (per curiam) (nonprecedential) (applying standard to retaliation claim based on ADEA opposition clause).  Even under the "participation clause," which the Third Circuit has suggested is more broadly protective of employees as compared to the "opposition clause," a plaintiff must at minimum "allege in the charge that his or her employer violated Title VII by discriminating against him or her on the basis of race, color, religion, sex, or national origin, in any manner." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266, 268 (3d Cir. 2006).  *Accord Klastow*, 515 F. App'x at 132 (citing 29 U.S.C. § 623(d)) ("Under the ADEA, an employee engages in protected activity by either opposing unlawful age discrimination or participating in proceedings *relating to unlawful discrimination*.") (emphasis added).[10]  Thus, any successful retaliation claim must have at its core a protected activity, which is in turn defined by reference to what is unlawful under, respectively, Title VII and the ADEA. Without such a foundation, a plaintiff can establish neither the first prong of a *prima facie* case, nor the third – under which the plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

O'Malley's case for retaliation rests on her having complained about Stein-Smith directly to her face or to others, either informally through emails and correspondence dating back to 2006, or by having brought a formal written internal complaint against Stein-Smith, *before* the August 7, 2008 meeting when the first of the three meetings was held that led to her termination. She argues that Stein-Smith's awareness of her objections and complaints motivated Stein-Smith to seek her termination in order to retaliate, and that by going through the disciplinary process, she was denied a form of safe harbor in which to complain about Stein-Smith as an unworthy supervisor and be protected from Stein-Smith's complaints about her.  In so fashioning her case,

---

[10] *See also Curay-Cramer v. Ursuline Acad. of Wilmington, Del.*, Inc., 450 F.3d 130, 135 n.4 (3d Cir. 2006) (noting that because Title VII and the ADEA are "comparable in many contexts," cases from both arenas would be cited).

O'Malley misses the critical point, which is that she needs to show that in her regular complaining about Stein-Smith, she was engaging in a protected employment activity. And so while the record demonstrates that O'Malley repeatedly criticized her supervisors' (and especially Stein-Smith's) conduct, sought the assistance of human resources personnel at times, and filed a written complaint with HR regarding Stein-Smith's treatment of her, she did not claim in her criticisms or her written complaint that Stein-Smith was picking on her based on any protected characteristic she has or activity she was engaged in. Contrary to O'Malley's repeated assertions that she was immunized from any adverse employment actions from the time she filed her complaint with FDU's HR personnel, the ADEA and Title VII do not protect an employee from the consequences of any and all complaints he or she makes or dissatisfaction he or she expresses. The law says that qualifying retaliation claims must involve activity explicitly protected under one of those statutory schemes. The Third Circuit was very clear about this in *Barber v. CSX Distribution Services*, 68 F.3d 694 (3d Cir. 1995), an ADEA case. There, the plaintiff's letter to the human resources department "complain[ed] about unfair treatment in general and express[ed] his dissatisfaction with the fact that someone else was awarded the position" he wanted, but did not "specifically complain about age discrimination." *Id.* at 701. The Third Circuit held that letter did not qualify as "the requisite 'protected conduct' for a *prima facie* case of retaliation." *Id. See also id.* at 702 ("A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination.").

O'Malley's complaints are similarly deficient. Her complaints, both formal and informal, are generalized grievances that do not allege discrimination based on age, sex, or national origin and do not demonstrate that O'Malley believed Stein-Smith was motivated by her age, sex, or national origin. Neither does the record reflect that, even if subjectively held, such a belief

would be objectively reasonable.  This is so going back to the earliest purported informal complaint in the record O'Malley provided: a memorandum or letter dated April 24, 2006, that she directed to Marcum, in which she mentions the "tense and less friendly" atmosphere in the library; that she was "disturbed by the way [she] was treated and not clear about [their] objectives for public services," presumably in connection with the then-recent reorganization; and that there had been a confrontation between Stein-Smith and her regarding offices. [D.E. 76-6, Ex. 42 to Pl. Opp'n to Mot. Summ. J.]  She also related an incident in which Stein-Smith gave another employee, "Richard," a lecture about covering the reference desk.  O'Malley mentions that she "may not speak English as eloquently as a native born American, but [she] is a hard worker with a strong work ethic."  [*Id.*]  She does not suggest, however, that anyone told her that her English skills were problematic – she simply takes issue with Stein-Smith's management decisions, which apparently included less-than-ideal treatment of another *male* employee, and her "antagonizing and controlling techniques."  [*Id.*]

Another frequently invoked incident suffers from the same shortcomings.  O'Malley zeroes in on an exchange between herself and Marcum, which Marcum appears to have forwarded to Stein-Smith, as the impetus for what she views as Stein-Smith's official crusade to use the FDU disciplinary process to oust her.  This written exchange, discussed in detail in Part II, began in pertinent part with a June 9, 2008 email from O'Malley to Marcum, in which she complains about Stein-Smith and asks him to keep it confidential.  The record includes a follow-up email from Stein-Smith to Marcum thanking him for his support and requesting that he end the "pattern of abuse" to which O'Malley subjected her.  [D.E. 76-4, Ex. 19 to Pl. Opp'n to Mot. Summ. J., Email from K. Stein-Smith to J. Marcum (June 9, 2008, 10:57 a.m.).]  Marcum responds that they would speak with HR, and likely "'walk through' the process: meeting w/ her,

give her a last chance, etc." [*Id.*, Email from J. Marcum (June 9, 2008, 11:41 a.m.).] That Marcum apparently decided to forward the email to Stein-Smith even though O'Malley did not want him to is irrelevant for purposes of O'Malley's Title VII and ADEA claims, and, in particular her retaliation claims. Nothing in O'Malley's communication to Marcum evidences a concern that she was being treated poorly because of her age, sex, or national origin. Instead, O'Malley repeatedly groups herself with other apparently dissatisfied members of the library staff. She has not, in this exhibit, pointed to the predicate "protected activity" as proof that Stein-Smith (and, arguably Marcum) embarked on the disciplinary process in order to punish her for complaining about Stein-Smith. As discussed earlier, O'Malley's August 2008 complaint that she submitted to FDU's HR department suffers from the same deficiency: there are no references to her employer's treatment *based on* protected characteristics.

Thus, O'Malley has not provided evidence from which a reasonable factfinder could conclude that she held a good faith, objectively reasonable belief, that her internal complaint (or complaints, if her informal complaints and criticisms are included) implicated Title VII or the ADEA. She similarly fails to point to any allegations she made to FDU that she was treated discriminatorily because of a protected trait. As O'Malley has provided no evidence that she engaged in a protected employment activity, she has failed to state even a *prima facie* case of retaliation. For this reason, FDU is entitled to summary judgment on O'Malley's retaliation claims.[11]

---

[11] It is likewise irrelevant, for purposes of O'Malley's ADEA and Title VII retaliation claims, precisely when she filed her internal complaint regarding Stein-Smith and whether FDU acted properly in addressing both that complaint and O'Malley's performance deficiencies in the August 2008 meeting. Even if O'Malley's complaint predated the discipline against her, the requisite causal nexus must link a protected activity to an adverse employment action, and O'Malley's complaint was not "protected activity" under the ADEA or Title VII. *See, e.g.*, *Curay-Cramer*, 450 F.3d at 134 ("Title VII's anti-retaliation provisions protect employees who

A final matter merits brief discussion. O'Malley has insisted throughout this litigation that FDU acted improperly in not providing a procedure for her to bypass Stein-Smith and report her complaints to someone above Stein-Smith, thereby effectively inviting the retaliation O'Malley claims to have experienced. In the complaint, briefing, and at oral argument, O'Malley's counsel invoked *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), as support for this theory. As adversary counsel pointed out at argument, however, to impose the requirements of a reporting framework developed in the Title VII context to O'Malley's claims, which, as discussed above, are devoid of any allegations of discrimination based on any protected characteristic or activity, would require the Court to provide legal protections developed in the context of and reserved for civil rights violations upon non-civil rights-based claims. It would be particularly inappropriate for the Court to do so where, as here, O'Malley gave FDU no notice of civil rights violations in her internal complaint which would provide a reason for FDU to give her a civil-rights-based forum for resolving her concerns.

The Court saw firsthand at argument that O'Malley's attorney argued the retaliation point with conviction, but this cannot substitute for legal precision. O'Malley cannot succeed on the basis that because she expressed dissatisfaction with a new supervisor arising out of how things operated in the workplace – essentially, how her supervisor chose to manage – she was immunized against any manner of discipline, regardless of her own job performance. That is not

---

participate in Title VII's statutory processes or who otherwise oppose employment practices made illegal by Title VII.").

what FDU's policies say,[12] and that is not what federal anti-discrimination laws do.  O'Malley is

not insulated from any and all discipline from the moment she complained about her supervisor

simply because she happens to be a woman, of Chinese heritage, who is 40 years of age or older.

FDU's Resolution Process, which O'Malley cites frequently, states only that employees will not

be disciplined "as a result of" using the process – it does not mean that employees cannot be

disciplined for *other* reasons.  [D.E. 76-3, Ex. 2 to Pl. Opp'n to Mot. Summ. J., Employee

Handbook.]  Likewise, the anti-retaliation provisions of the ADEA and Title VII bar adverse

action only when it is the result of the employee engaging in certain protected activity.

O'Malley's argument suggests that she fundamentally misunderstands the distinction.  Nor must

FDU carry out its disciplinary process differently – specifically, in a manner that excludes Stein-

---

[12] The copy of the employee handbook provided by O'Malley herself states, in discussing FDU's "Open Door Policy," that:

> Even though our open door policy will serve to address and solve many problems before they become serious, *there will be times when department chairs/school directors, deans, supervisors and managers will need to communicate to an employee that his or her performance or conduct does not meet acceptable standards.  This is handled through our disciplinary process.*

[D.E. 76-3, Ex. 2 to Pl. Opp'n to Mot. Summ. J., Employee Handbook (emphasis added).]

Likewise, discussing FDU's "Resolution Process," the handbook states that it:

> is a method for employees to have a management review of incidents/issues that results [sic] in formal counseling or corrective action.  Employees are able to participate in the Resolution Process without fear of retribution.  No employee will be disciplined, harassed or treated unfairly in any manner *as a result of* using the Resolution Process.

[*Id.* (emphasis added).]

This language does not wholesale preclude the application of discipline as O'Malley contends.  It *expressly contemplates* a role for discipline – indeed, it appears that the "Resolution Process" may *begin* with a disciplinary incident that the employee takes issue with.  The "Resolution of Differences" policy, allowing an employee a forum for raising conflicts, or "differences," between the employee and his or her supervisor, also does not preclude discipline: it states that it applies only to issues "not specifically covered by University policy or established University procedure."  [Aversa Cert., Ex. BB.]

Smith from having any input or role – just because O'Malley happens to possess certain protected characteristics.[13]

O'Malley's frequent complaints did not earn her a special forum to challenge her supervisor or freedom from discipline when she defied her supervisor. To do otherwise, to confer federal protection and award damages, anoints insubordination and makes a mockery of the remedial statutes and legal holdings that were hard-won over time, and not intended to promote contention and disarray in the workplace.

### d. _Hostile Work Environment Arguments_

To the extent O'Malley raises a claim for a hostile work environment under either the ADEA or Title VII with respect to her age, sex, or national origin, or based on the retaliation she claims to have experienced, she has similarly failed to proffer sufficient evidence that a genuine dispute of material fact exists sufficient to defeat summary judgment. Hostile work environment claims require a plaintiff to prove that the "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" _Culler v. Sec'y of U.S. Veterans Affairs_, 507 F. App'x 246, 249 (3d Cir. 2012) (nonprecedential) (quoting _Nat'l R.R. Passenger Corp. v. Morgan_, 536 U.S. 101, 116 (2002)). "The discrimination must be 'because of' the employee's protected status or activity." _Id._[14] This analysis applies to hostile work environment

---

[13] Indeed, the "Resolution of Differences" policy and the "Resolution Process" language in the employee handbook both contemplate the supervisor's playing a role (and, of course, being informed of the employee's complaints), as does the FDU disciplinary process. [Aversa Cert., Ex. BB (Resolution of Differences policy); D.E. 76-3, Ex. 2 to Pl. Opp'n to Mot. Summ. J., Employee Handbook (Resolution Process); D.E. 76-4, Ex. 17 to Pl. Opp'n to Mot. Summ. J. (Disciplinary Process).]

[14] The discrimination must also be "severe or pervasive"; it must "detrimentally affect[]" the employee; it must be such that it "would detrimentally affect a reasonable person in like

claims brought under Title VII, and, while the Third Circuit has not decided whether a hostile work environment claim may be brought pursuant to the ADEA, it has assumed that the analysis under that statute would be the same. *See id.* at 249 n.3; *see also Slater v. Susquehanna Cnty.*, 465 F. App'x 132, 138 (3d Cir. 2012) (nonprecedential) (same). O'Malley's claims fail under the "because of" language – just as she has failed to adduce evidence illustrating that she was treated differently because of age, sex, or national origin, and just as she has not raised a genuine dispute with respect to whether she engaged in a protected activity under the ADEA or Title VII, she has failed to show that the hostile environment she allegedly experienced had anything to do with these protected characteristics or any protected activity.

3. <u>Common Law Claims</u>

O'Malley has also asserted a claim for breach of contract, grounded in allegations that FDU's termination of her employment violated contractual promises made in an employee handbook. [Compl. ¶¶ 108-118.] She contends that even if the handbook did not give rise to a contractual relationship, she was induced to rely on it in filing her internal complaint. [*Id.*]

O'Malley further claims that FDU's "agents" defrauded her by, *inter alia*, and misrepresenting her termination appeal rights and whether she should seek the assistance of the EEOC. [Compl. ¶¶ 119-132.] O'Malley also characterizes Stein-Smith's "accusations" about her conduct, and FDU's alleged failure to adhere to its policies, as fraudulent. [*Id.*]

Having decided that summary judgment is appropriate on O'Malley's federal claims, the Court may, and does, decline to exercise supplemental jurisdiction over the remaining common law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed

---

circumstances"; and *respondeat superior* liability must exist. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

all claims over which it has original jurisdiction."). *See also Garges v. People's Light & Theatre Co.*, 529 F. App'x 156, 163-64 (3d Cir. 2013) (nonprecedential) (holding that district court did not abuse discretion in declining to exercise supplemental jurisdiction over state law claims for, *inter alia*, breach of contract, after granting summary judgment to defendants "on all of the federal claims over which it had original jurisdiction," including a Title VII claim, "because the legal standards that apply to these claims differ from the standards that apply to [the] federal claims"), *pet'n for cert. filed* (Oct. 28, 2013) (No. 13-7189); *Campbell v. W. Pittston Borough*, 498 F. App'x 186, 190 (3d Cir. 2012) (nonprecedential) (alteration in original) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."). Accordingly, those claims are dismissed.

**IV.**     **Conclusion**

For the reasons indicated above, O'Malley's motion for reconsideration [D.E. 78] is **GRANTED,** and as a consequence FDU's application for fees in connection with opposing it is denied. However, the Court is satisfied from its review of the record and the parties' arguments that no reasonable factfinder could decide in O'Malley's favor on her claims under the ADEA or Title VII. Accordingly, FDU's motion for summary judgment [D.E. 66] is **GRANTED** as to counts one and two. The Court declines to exercise supplemental jurisdiction over counts three and four. An appropriate order will issue.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: January 7, 2014